IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 17, 2018 Session

IN RE L.U.S.

Appeal from the Chancery Court for Sullivan County
No. 16-CK-40462M       John S. McLellan, III, Judge

_____

No. E2017-01777-COA-R3-PT

_____

In this termination of parental rights case, C.J.S. and K.R.S. (petitioners) filed a joint petition for adoption and petition to terminate the rights of C.C.S. (father) and W.J.N.R. (mother) with respect to their only child, L.U.S. Father joined the petition as a co-petitioner, consenting to the termination of his rights and to the adoption of the child. The trial court found clear and convincing evidence to terminate mother and father's parental rights on the grounds of abandonment by failure to support and abandonment by failure to visit. By the same quantum of proof, the court found that termination of parental rights is in the best interest of the child.[1] Mother appeals the trial court's order terminating her rights. We vacate the court's findings with respect to the ground of abandonment by failure to support; nevertheless, we affirm the court's order terminating mother's rights because there is clear and convincing evidence that termination is supported by the ground of abandonment by failure to visit and is in the best interest of L.U.S.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

C. Christopher Raines, III, Kingsport, Tennessee, for the appellant, W.J.N.R.

_____

[1] Although the trial court did not fully adjudicate petitioners' claim for adoption, the court certified its order as final pursuant to Tenn. R. Civ. P. 54.02, which allows a trial court to "direct the entry of a final judgment as to one or more but fewer than all the of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." *See In re Colton R.*, No. E2016–00807–COA–R3–PT, 2017 WL 499439, at *6 n.8 (Tenn. Ct. App., filed Feb. 7, 2017); *In re Abbigail C.*, No. E2015–00964–COA–R3–PT, 2015 WL 6164956, at *7 (Tenn. Ct. App., filed Oct. 21, 2015).

Jared A. Williams, Kingsport, Tennessee, for the appellees, C.J.S. and K.R.S.

**OPINION**

**I.**

L.U.S. was born on February 27, 2012. At the time, mother and father lived with petitioners, who are the child's paternal grandparents. A pediatric exam conducted on March 6, 2012, revealed that the child was suffering from neonatal drug withdrawal syndrome, a diaper rash, and port wine nevus. One night in July 2012, petitioners observed that mother was "visibly high." According to petitioners, mother attempted to leave with the child the next morning; however, petitioners refused to allow her to leave with the child. They eventually called the police. According to petitioners, mother left before the police arrived and said, "I'm done. You all can just have her." On August 27, 2012, the Juvenile Court for Sullivan County adjudicated the child dependent and neglected and awarded temporary custody of the child to petitioners. The court's order permitted mother to have supervised visitation from 1:30 p.m. until 6:00 p.m. on Mondays and Fridays until further order of the court.

At trial, Judy Moody, a CASA volunteer, testified that mother's visitations were "inconsistent." Specifically, Ms. Moody testified that mother "would go sometimes for several weeks and – and visit regularly but other times she might go several weeks and not visit." On June 29, 2015, mother's visitation with the child was cut short due to concerns about mother's behavior and possible intoxication and/or substance abuse.

Shortly thereafter, CASA filed a motion with the juvenile court requesting the suspension of mother's visitation rights. On July 17, 2015, after a hearing on the motion, the juvenile court entered an order requiring mother to: (1) submit to the regular professional care of a doctor, psychiatrist, or MSW who is adequately able to assist her in restoring and maintaining her mental health; (2) submit to another alcohol and drug assessment by September 1, 2015, and follow all recommendations; (3) submit to another mental health assessment by September 1, 2015, or provide a mental health assessment completed since January 23, 2015, and complete all recommendations resulting from said assessments. The order further declared that "mother's visitations shall be suspended until she demonstrates compliance with the Court's orders and exhibits positive change[.]"

On December 25, 2015, mother voluntarily enrolled in a twenty-eight day intensive inpatient rehabilitation program. Mother testified, and the trial court found, that mother successfully completed the program and was released to an intensive outpatient (IOP) rehabilitation program at Oxford Harmony House on January 22, 2016. The trial court found that Mother lived at Harmony House from January 22, 2016 until she completed the program on an unspecified date in June 2016.

In February 2016, mother filed a petition to restore visitation. That petition was dismissed, however, when mother failed to appear at the March 2016 hearing on the petition. Mother testified that she failed to appear due to a conversation she had with Ms. Moody the day before the hearing. According to mother, Ms. Moody said that mother would be arrested if she appeared at the hearing due to an outstanding warrant for her arrest.[2] Ms. Moody, on the other hand, testified that she "told [mother] that she needed to talk to the court . . . if she wanted to cancel the meeting." Ms. Moody also testified that she told mother that there was an open warrant for her arrest. However, Ms. Moody said that she had discussed this with mother "several times before" and that mother "had told [Ms. Moody] that she was going to go take care of it." Ms. Moody testified that she followed up with mother "at least three times" about "tak[ing] care of that legal responsibility." Ms. Moody insisted, however, that she never told mother that she would be arrested if she appeared at the hearing. The trial court believed Ms. Moody to be a more credible witness on this issue.

The only evidence relating to mother's employment, income, and expenses during her stay at Harmony House came from mother's own testimony. Specifically, mother testified that she worked part-time at Papa John's, where she earned $400 per month.[3] Mother testified that her only other sources of income were food stamps and a $700 tax refund.[4] Although mother testified that her only expenses were rent (which she claimed was $400 per month) and groceries, she also testified that she bought a five-dollar pack of cigarettes every day. Mother testified that she used the $700 tax refund to pay overdue rent. According to mother, she was unable to work full-time because in order to maintain her housing she had to attend daily IOP sessions from 9:00 a.m. until 12:00 p.m. and had to attend five AA and NA meetings per week.

On June 7, 2016, petitioners filed their joint petition for adoption and termination of parental rights. Following a hearing, the trial court terminated mother's rights on the grounds of abandonment by failure to support and abandonment by failure to visit. Mother appealed.

---

[2] Mother testified that she was charged with simple possession of Xanax and failed to appear at a court cost review.

[3] Ms. Moody testified that mother also worked at two other fast food restaurants – McDonald's and Burger King – for a very brief period of time; however, neither party introduced evidence of mother's income from those jobs. Ms. Moody agreed that mother's longest period of employment was when she worked at Papa John's for "maybe six to eight months[.]"

[4] Mother also testified that when she filed her petition to restore visitation, one of her friends paid the $127 filing fee.

## II.

Mother raises the following issues, which we have slightly restated:

> Whether the trial court erred in finding clear and convincing evidence to terminate mother's parental rights on the ground of abandonment by failure to support.

> Whether the trial court erred in finding clear and convincing evidence to terminate mother's parental rights on the ground of abandonment by failure to visit.

> Whether the trial court erred in finding that clear and convincing evidence supports a finding that the termination of parental rights is in the best interest of L.U.S.[5]

## III.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash–Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (2017). Because termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and

---

[5] The statement of issues in mother's brief only challenges the trial court's findings relative to the ground of abandonment; nevertheless, "the Court of Appeals must review the trial court's findings as to each ground for termination *and as to whether termination is in the child's best interest*[ ], regardless of whether the parent challenges these findings on appeal." *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) (emphasis added).

convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

The Tennessee Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual

- 5 -

findings." ***In re Adoption of S.T.D.***, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing ***Seals v. England/Corsair Upholstery Mfg. Co., Inc.***, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

### A.

Tenn. Code Ann. § 36-1-113(g)(1) provides that parental rights may be terminated on the ground of abandonment. Tenn. Code Ann. § 36-1-102(1)(A)(i) further defines "abandonment" to include "willfully fail[ing] to visit or . . . willfully fail[ing] to support" a child "[f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . ."[6] Here, the petition to terminate parental rights was filed on June 7, 2016; therefore, the relevant four-month period is February 7, 2016 to June 6, 2016.[7]

We will first consider whether mother abandoned L.U.S. by willfully failing to support the child during the relevant four-month period. "Whether a parent failed to visit or support a child is a question of fact." ***In re Adoption of Angela E.***, 402 S.W.3d 636, 640 (Tenn. 2013) (citations omitted).

Here, the trial court found that mother failed to pay any support during the four months immediately preceding the filing of the petition. Both mother and petitioners testified that mother previously sent gifts and clothes to the child but that mother failed to pay any support or send any gifts during the relevant four-month period.[8] Therefore, the evidence preponderates in favor of the trial court's factual finding.

"Whether a parent's failure to visit or support constitutes *willful abandonment . . .*

---

[6] As this Court recently explained, "willfulness" is no longer part of the statutory definition of abandonment; instead a parent may demonstrate the absence of willfulness as an affirmative defense. ***In re Gabriel B.***, No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 n.7 (Tenn. Ct. App., filed July 23, 2018). "Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case." ***Id.*** (citing ***In re D.A.H.***, 142 S.W.3d 267, 273 (Tenn. 2004)).

[7] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." ***In re Jacob C.H.***, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App., filed Feb. 20, 2014).

[8] Mother was asked on multiple occasions whether she paid any support during the relevant four-month period. On one such occasion, she testified that she had; however, her answer, which referred to sending holiday gifts, indicates that she may have misunderstood the question. When compared to mother's earlier testimony and the testimony of petitioners, this isolated statement does not carry much evidentiary weight.

is a question of law. We review questions of law de novo with no presumption of correctness." ***Id.*** (emphasis added). We have consistently held that "[f]ailure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *E.g.*, ***In re Audrey S.***, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). That rule is rooted in the principle that "[a] parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control." ***In re Adoption of Angela E.***, 402 S.W.3d at 640.

Here, the trial court determined that mother's failure to support the child was willful for the following reasons: mother testified that she understood her moral obligation to pay support, even in the absence of a court order; mother "worked for several employers and earned various wage amounts generally in the fast-food industry"; mother "supported her own needs including a $5.00 per day cigarette habit"; mother "used a 2016 tax return of $700 to pay rent"; mother used borrowed money to pay court costs instead of paying support.[9]

The trial court was correct to highlight mother's awareness of her duty to support the child, even in absence of a court order. However, the court glossed over the question of whether mother had the financial *capacity* to support the child during the relevant time period. Mother testified, without contradiction, to the following sources of income: a paycheck of $400 per month from Papa John's, food stamps, and a $700 tax refund. Mother testified that her expenses included groceries and rent at Harmony House, which was $400 per month. Mother also admitted to purchasing a five-dollar pack of cigarettes every day. According to mother, she was unable to work full-time because Harmony House required her to attend IOP sessions Monday through Friday from 9:00 a.m. until 12:00 p.m. as well as five AA and NA classes per week. Mother testified that if she did not attend these meetings, she would lose her housing. Petitioners offered no additional evidence of mother's income, expenses, or ability to work longer hours.

We hold that the foregoing facts do not clearly and convincingly demonstrate that mother's failure to support was willful. Mother cannot be blamed for using her $400 monthly paycheck to pay rent at an IOP rehabilitation facility. In fact, we have previously indicated that a parent's "attempt[ ] to remedy her drug problems through some sort of rehabilitation" may, under the appropriate circumstances, constitute a "justifiable excuse" for not paying child support. *See* ***In re Destiny H.***, No. W2015–00649–COA–R3–PT, 2016 WL 722143, at *10 (Tenn. Ct. App., filed Feb. 24, 2016). Nor can mother be blamed for using her tax refund to pay overdue bills. *See* ***In re Alysia S.***, 460 S.W.3d 536, 559, 568, 572 (Tenn. Ct. App. 2014) (holding that mother's failure to support was not willful even though she used income to pay overdue bills). Because

---

[9] In April or May of 2017, Mother paid twenty dollars toward her $2,000 in unpaid court costs. Because this occurred outside the relevant four-month period, we will not address it.

the trial court apparently credited mother's testimony that Harmony House required mother to attend daily IOP sessions and multiple AA and NA meetings each week, we must also accept mother's testimony that she was unable to work full-time during the relevant four-month period.

The only fact that could possibly indicate that mother had the capacity to pay support is mother's decision to purchase a five-dollar pack of cigarettes every day during the four-month period. Although a parent's decision to purchase "non-necessities" is "*relevant* to determining whether a parent willfully has failed to support his or her child," such a decision "*by itself* does not establish willfulness." *In re Addalyne S.*, 2018 WL 1976175, 2018 WL 1976175, at *10 (Tenn. Ct. App., filed Apr. 26, 2018); *In re Karissa V.*, No. E2016–00395–COA–R3–PT, 2017 WL 758513, at *11 (Tenn. Ct. App., filed Feb. 27, 2017) (emphasis added). Absent other evidence of a parent's capacity to pay support, a parent's purchase of non-necessities, such as cigarettes, does not amount to clear and convincing evidence that the parent willfully failed to support the child. *In re Douglas H.*, No. M2016–02400–COA–R3–PT, 2017 WL 4349449, at *7 (Tenn. Ct. App., filed Sept. 29, 2017) ("Although Mother purchased cigarettes and personal hygiene items and worked in the past, we do not consider that sufficient evidence of Mother's willful failure to support Tailor, which is necessary to satisfy the clear and convincing standard of proof."); *cf. In re Kira G.*, No. E2016–01198–COA–R3–PT, 2017 WL 1395521, at *6 (Tenn. Ct. App., filed Apr. 2017) (involving additional evidence of a parent's capacity to support); *In re Miracle M.*, No. W2017–00068–COA–R3–PT, 2017 WL 3836020, at *6 (Tenn. Ct. App., filed Aug. 30, 2017) (involving additional evidence of a parent's capacity to support).

Here, mother was completely justified in using her limited income to pay rent at an IOP rehabilitation facility. No evidence was offered to support the argument that mother could have worked additional hours throughout the week; in fact, the only evidence presented was to the contrary. Finally, mother's testimony that she bought cigarettes during the relevant four-month period is insufficient standing alone to produce a "firm belief or conviction" in our minds that mother's failure to pay support was willful. *See In re Alysia S.*, 460 S.W.3d at 572. Because petitioners failed to present clear and convincing evidence that mother's failure to support was willful, we vacate the trial court's findings with respect to this ground.

**B.**

We now consider whether mother abandoned L.U.S. by willfully failing to visit the child during the relevant four-month period. It is undisputed that mother has not seen the child since mother's last supervised visit on June 29, 2015. The only question, therefore, is whether mother's failure to visit was willful.

Although "[t]he parental duty of visitation is separate and distinct from the

parental duty of support," the standard for determining whether a parent's conduct was willful is the same. *In re Adoption of Muir*, No. M2004-02652-COA-R3-CV, 2005 WL 3076896 (Tenn. Ct. App., filed Nov. 16, 2005). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

The trial court determined that mother's failure to visit the child was willful because mother "had the ability and means to regain her visitation rights and of her own volition, failed to do so." Specifically, the court observed that mother

> failed to complete compliance with the Sullivan County Juvenile Court's Order of July 17, 2015, and failed to prosecute her Petition to be granted supervised visits which was set for hearing March 23, 2016, which resulted in her attorney dismissing the Petition for failure to appear such that [mother's] last visit with [the child] was June 29, 2015, nor has [mother] contacted Petitioners since the suspension of her visitation rights.

Mother, on the other hand, argues that her failure to visit was not willful because the juvenile court's July 17, 2015 order prohibited mother from contacting the child. Mother also argues that she attempted to regain visitation and made several efforts to remain part of the child's life. For example, mother claims that she sent gifts to the child through father and that she occasionally spoke with the child over the phone during father's visitation time. Mother also testified that she attempted to contact petitioners by phone and through Facebook messages, but petitioners either did not respond or told mother that there was a no contact order. Finally, mother points to the fact that she filed a petition to restore visitation. According to mother, she failed to prosecute that action only because she feared getting arrested. Mother also claims she did not have the money to file another petition.

In *In re Adoption of Angela E.*, our Supreme Court held that a court order temporarily suspending a parent's visitation rights does not automatically preclude a finding that the parent willfully failed to visit the children. 402 S.W.3d 636, 642 (Tenn. 2013). In that case, the trial court suspended the father's visitation rights but provided that the father could "file a Petition with the Court to have a hearing thereon at his earliest convenience." *Id.* at 638. Father did file a petition to reinstate visitation, but his petition was dismissed after he failed to attend the hearing on the petition. *Id.* Father claimed that he never received notice of the date of the hearing. *Id.* He took no action to restore visitation until a termination petition was filed two years later. *Id.* at 642. The Supreme Court held that father "had no reasonable excuse for failing to pursue the petition to reinstate visitation during those two years." *Id.* According to the Court, "this

[was] not a case in which a parent was actively trying to maintain visitation." *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (parents actively pursuing legal proceedings to regain custody); *In re Chelbie F.*, No. M2006–01889–COA–R3–PT, 2007 WL 1241252, at *6 (Tenn. Ct. App., filed Apr. 27, 2007) (father actively pursuing a court order to establish visitation rights)).

In so holding, the Supreme Court approvingly cited this Court's decisions in *In re Elijah B.*, No. E2010–00387–COA–R3–PT, 2010 WL 5549229, at *8 (Tenn. Ct. App. Dec. 29, 2010) and *State of Tennessee Department of Children's Services v. J.A.H.*, No. E2005–00860–COA–R3–PT, 2005 WL 3543419, at *5 (Tenn. Ct. App. Dec. 28, 2005). Both of those cases involved court orders that suspended a parent's visitation rights until the parent submitted to drug testing. *Id.* In both cases, this Court held that the parent's "choice in refusing to cooperate in this regard constituted a willful decision to discontinue visiting the [children]." *J.A.H.*, 2005 WL 3543419, at *6; *see also In re Elijah B.*, 2010 WL 5549229, at *8.

In the present case, mother's visitation was suspended until she could "demonstrate[ ] compliance with the [July 17, 2015 order] and exhibit[ ] positive change." As previously discussed, the juvenile court's order required mother to: (1) submit to the regular professional care of a doctor, psychiatrist, or MSW who is adequately able to assist her in restoring and maintaining her mental health; (2) submit to another alcohol and drug assessment by September 1, 2015, and follow all recommendations; (3) submit to another mental health assessment by September 1, 2015, or provide a mental health assessment completed since January 23, 2015, and complete all recommendations resulting from said assessments.

Although Mother successfully completed intensive inpatient and outpatient treatment programs, there is no evidence in the record that mother completed any of the specific requirements set forth in the juvenile court's order. Those requirements were neither difficult to comprehend nor difficult to complete. Mother's "choice in refusing to cooperate in this regard constituted a willful decision to discontinue visiting the [child]." *See J.A.H.*, 2005 WL 3543419, at *6; *see also In re Elijah B.*, 2010 WL 5549229, at *8.

We are also not persuaded that mother "was actively trying to maintain visitation." *See In re Adoption of Angela E.*, 402 S.W.3d at 642. As explained above, the Supreme Court has held that simply filing a petition to restore visitation does not conclusively establish that a parent's failure to visit was not willful if the parent subsequently fails to proceed with the petition. *See id.* In this case, mother did just that – she filed a petition to restore visitation but then failed to appear at the hearing on the petition. The trial court credited the testimony of Ms. Moody, who stated that she told mother to talk to the court if she wanted to postpone the hearing on her petition. Mother did not do so, nor did she file another petition to restore visitation after she resolved her other legal issues. Mother argues that she failed to file another petition because she lacked the money to do so.

Even if that is true, there is still no evidence that mother complied with the specific requirements of the July 17, 2015 order, which was a precondition to the reinstatement of her visitation rights.

Mother also testified that she sent gifts to the child through father and occasionally spoke with the child over the phone during father's visitation time. It is unclear, however, whether that alleged communication occurred during the relevant four-month period. Finally, mother claims that she attempted to contact petitioners by phone and through Facebook messages. At trial, however, petitioners could not recall receiving any Facebook messages from mother and could only remember receiving one phone call from mother. According to petitioners, mother called sometime in 2016 to tell them that she wanted petitioners to adopt the child but that she still wanted to be "in her life." The trial court found that mother had not "contacted Petitioners since the suspension of her visitation rights." We accept the trial court's implicit determination that petitioners were more credible than mother on this issue; in light of petitioners' testimony, however, the preponderance of the evidence supports a finding that mother contacted petitioners at least once during 2016. Nonetheless, that singular phone call does not persuade us that mother "was actively trying to maintain visitation." *In re Adoption of Angela E.*, 402 S.W.3d at 642.

In view of the foregoing analysis, we hold that the trial court did not err in finding clear and convincing evidence to terminate mother's parental rights on the ground of abandonment by failure to visit.

## V.

## A.

Because at least one statutory ground warrants the termination of mother's rights, we now focus on whether termination is in the best interest of L.U.S. We are guided by the statutory factors set forth in Tenn. Code Ann. § 36-1-113(i) (2017), which provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a

- 11 -

lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

**B.**

The trial court expressly considered the best interest factors listed above. The court determined that factors (1), (3), (4), (5), (7), and (9) weighed in favor of a finding that termination of mother's rights was in the best interest of L.U.S.

Although we commend mother for successfully completing intensive inpatient and outpatient rehabilitation programs, the preponderance of the evidence supports the trial court's finding that mother has still not complied with the requirements of the juvenile court's July 17, 2015 order. That order set forth the precise "adjustment of circumstances, conduct, or conditions" that mother needed to accomplish before she could regain visitation. Because those conditions remain unsatisfied, factor (1) weighs in favor of termination.

It is undisputed that mother has not seen the child since her last supervised visit on June 29, 2015. Consequently, factor (3) weighs in favor of termination. Mother believes that the child still asks about her and would recognize mother if she saw her. However, when mother was asked whether she believed that there is a mother/daughter relationship, mother said "[p]robably not at this point, no, but I want the chance to rebuild that, yes." In light of their long-term separation and mother's own testimony about her relationship with the child, factor (4) also weighs in favor of termination.

With respect to factor (5), the trial court determined that a change in caretakers "would be 'devastating' to the child." In support of this conclusion, the court found that "[L.U.S.] is now a safe, happy, healthy and well-adjusted child in the care and custody of her paternal grandparents, whom the child views as her mother and father who provide a stable and structured home environment." The evidence preponderates in favor of the court's finding. L.U.S. has been in the custody of petitioners since she was four months old. Petitioners testified that they have adequately attended to the child's material, physical, and spiritual needs since that time. The paternal grandmother testified that the child calls her "mom" and regards both petitioners as her parents.

The trial court also found that factor (7) weighed in favor of termination because "[t]here is no evidence in the record of whether [mother's] home is healthy and safe concerning whether [mother's] boyfriend would be an appropriate person for [the child] to be around or cared for during times when [mother] is not at the residence." The court seemed particularly concerned that mother now lives with her boyfriend, who the court describes as "a convicted felon who inherited a house [from his deceased parents]." We do not think the evidence preponderates in favor of a finding that mother's new residence is unhealthy or unsafe or that "there is criminal activity in the home." There was virtually no testimony about mother's new home except for the fact that it belongs to her boyfriend. Mother testified that he was convicted of forgery over sixteen years ago, but

- 13 -

that he now has a job and pays their bills. While not a traditional or ideal living arrangement, petitioners did not present evidence that the home is unsafe for the child. We therefore vacate the trial court's findings with respect to this factor.

With respect to factor (9), mother was never ordered to pay child support. It is undisputed that mother occasionally sent the child gifts and clothes, but mother never paid support to petitioners. This factor, therefore, weighs in favor of termination.

Because factors (1), (3), (4), (5), and (9) weigh in favor of termination, and because the other factors are either neutral or inapplicable, we hold as a matter of law that there is clear and convincing evidence that termination of mother's parental rights is in the best interest of L.U.S.

## VI.

The judgment of the trial court is affirmed as modified. The costs on appeal are assessed to the appellant, W.J.N.R. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE